LOCALS 1140 AND 1145, UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA, v. UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA AND OTHERS.[1]

December 15, 1950.

Nos. 35,211, 35,212.

---

[1]Reported in 45 N. W. (2d) 408.

*Roger S. Rutchick, Francis M. Smith, Kenneth J. Enkel,* and *David Scribner,* for appellants.

*Hall, Smith & Hedlund,* for respondents.

LORING, CHIEF JUSTICE.

This case originated in two separate suits for declaratory judgments and injunctive relief, brought by Locals 1140 and 1145, UE, against UE and District Council No. 11, UE.[2] In each suit defendants demurred to the complaint and moved to exclude plaintiffs' counsel. The district court denied the motions to exclude counsel and overruled both demurrers, certifying the questions presented as important and doubtful. Defendants are here on appeals from these orders of the district court. The appeals in the two cases have been consolidated in this court pursuant to a stipulation and order.

Plaintiffs, hereinafter referred to as Local 1140 and Local 1145, are voluntary, unincorporated labor organizations. Local 1140 has approximately 4,000 members, who are employed by more than 27 employers in Minneapolis and St. Paul. Local 1145 has approximately 5,000 members, who are employes of the Minneapolis-Honeywell Regulator Company, Minneapolis. Defendant UE is an international, voluntary, unincorporated labor organization with headquarters in New York City. It is composed of affiliated local unions in all parts of the United States. Defendant District Council No. 11, UE, is a council composed of delegates elected from local UE unions in Illinois, Wisconsin, and Minnesota.

In 1937, various employes in Minneapolis and St. Paul who were members of unions affiliated with the International Association of Machinists[3] disaffiliated from that organization and joined what later became Local 1140. August 28, 1937, Local 1140, received a charter from UE designating it as Local 1140, affiliated with CIO.[4]

[2]"UE" as used herein refers to the United Electrical, Radio and Machine Workers of America. This union was originally designated "United Electrical and Radio Workers of America."

[3]Affiliated with the American Federation of Labor.

[4]"CIO" as used herein refers to the Congress of Industrial Organizations, except that the CIO with which UE was affiliated at the time it chartered Local 1140 was then designated the "Committee of Industrial Organizations." The Committee of Industrial Organizations originated as a caucus group of international unions which formed within the AFL and later split off from the AFL as a result of policy disputes.

In 1939, employes at Minneapolis-Honeywell Regulator Company organized a labor union. In June 1939, this union received a charter designating it as Local 1145, UE-CIO. At the time UE issued charters to Locals 1140 and 1145, UE was affiliated with CIO. It is alleged that there was an implied agreement by UE to remain affiliated with CIO; that affiliation of UE with CIO was a decisive factor in the desire of members in both local unions to affiliate their unions with UE; that the CIO affiliation was a major inducement to employes who joined the two locals and UE; that the two locals held out CIO affiliation of UE to employes as a major inducement to join the locals; that both locals and UE engaged in all manner of union activities, holding themselves out to other unions, employes, the government, the public, and to all concerned as CIO unions, thereby benefiting in many respects from the status enjoyed by CIO unions.

For reasons relating to its conduct, UE was expelled from the CIO on or about October 31, 1949. The loss of UE's CIO affiliation exposes both Local 1140 and Local 1145 to raids and attacks by CIO and by AFL unions. The absence of CIO affiliation jeopardizes the rights of both locals in existing collective bargaining contracts negotiated by the locals as CIO unions. One large employer has already terminated its contract with Local 1140 because of the uncertainty created by the CIO expulsion of UE.

Both locals have accumulated substantial funds, bonds, office furniture and equipment, personal property, and real estate out of the dues paid to them by members. Both locals have discharged all obligations to UE with respect to payment of moneys and the making of reports, as required by the UE constitution.

After UE's expulsion from CIO, 2,000 members of Local 1145 voted to disaffiliate from UE, and, when dissenting votes were called for, none were cast. A majority of the members of Local 1140, who voted on the matter of disaffiliation, also voted to disaffiliate from UE. In Local 1140, however, more than seven members voted against such disaffiliation.

UE has stated to the officers of Local 1140 and Local 1145 that if these locals persist in their attempts to disaffiliate UE will invoke provisions of its constitution to prevent such disaffiliation, to take the funds and property of the locals, and to subject members who seek disaffiliation of the locals to charges and discipline.

■ Although plaintiffs seek declaratory judgments and injunctive relief in numerous respects, the critical question, on which all matters rest, is whether the above facts state a cause of action which entitles plaintiffs to a judgment declaring that Local 1140 and Local 1145 may disaffiliate from UE and take their assets with them. Since each of these cases comes to us on appeal from an order overruling a demurrer to the complaint, we must take the facts alleged in each complaint as true.[5] We must also regard the demurrers as admitting all necessary inferences or conclusions of law, whether stated or not, which follow from facts well pleaded.[6] The demurrers also admit inferences of fact which may reasonably be drawn from the facts expressly pleaded.[7] The demurrers in these cases rest upon the contention that the complaint in each case fails to state a cause of action. It has been stipulated in these cases that we may consider the constitution of UE and the constitutions and charters of both locals as parts of the complaints in ruling on these demurrers. The outcome of the votes taken in the local unions with respect to disaffiliation is also stipulated and may be considered.

■ In order to make the theory of these suits clear, it is well to state that they arise in a contract setting. The contract in each case is comprised of (1) the UE constitution, (2) the local union's constitution, and (3) the local union's charter. By well-established rule, these instruments constitute a contract between

[5]State ex rel. City of Waseca v. Babcock, 151 Minn. 321, 325, 186 N. W. 688, 690. See, Faber v. Enkema, 180 Minn. 493, 231 N. W. 410; see, also, Hollister v. Ulvi, 199 Minn. 269, 277, 271 N. W. 493, 497; Stevens v. Staples, 64 Minn. 3, 65 N. W. 959.

[6], [7]These rules are well stated and abundantly supported by citation of Minnesota case law in 2 Pirsig's Dunnell, Minn. Pl. (3 ed.) § 1622, notes 54 and 55.

the parent union and the local union.[8] Although one eminent legal writer has condemned the "constitutions-are-contracts" theory as being a legal fiction,[9] this court and many other courts are so far committed to the theory that we feel that we must now abide by it.

Treating the constitutions and charters in these cases as contracts and recognizing that the party litigants here are primarily UE versus the two local unions, the legal relationship here in dispute is the contract relationship between UE and the two locals. The contract provisions primarily in dispute are found in the UE constitution,[10] art. 18, §§ N and O. In brief, § O provides that a local union may not disaffiliate from UE so long as seven or more members of the local vote to retain the UE charter, and

[8]Clark v. Fitzgerald, 197 Misc. 355, 93 N. Y. S. (2d) 768, 25 L. R. R. M. 2115; Duris v. Iozzi, 6 N. J. Super. 530, 70 A. (2d) 793. In the cases cited, the existence of a contract relationship between the parent union and the local was assumed without discussion. In Minnesota, the contract theory of constitutions and charters was applied in State v. Postal, 215 Minn. 427, 10 N. W. (2d) 373, and Liggett v. Koivunen, 227 Minn. 114, 34 N. W. (2d) 345.

[9]See, Chafee, *The Internal Affairs of Associations Not for Profit,* 43 Harv. L. Rev. 1001-1010.

[10]"Section N. If a local disbands, the local secretary and trustees shall send all funds and property belonging to the local to the General Secretary-Treasurer. The General Secretary-Treasurer shall hold this property intact for one year. If within that time, an application is made by at least fifteen (15) former members, a charter will be reissued and the funds and the property returned. Should no application be made within the year, the funds and property shall revert to the International Union.

"Section O. Any local union whose good standing members fall below seven (7) may have its charter revoked in accordance with the provisions of Article 18, Section N, and Article 10, Section I, of the International Constitution. Members of such a group may become members-at-large, affiliated directly with the International Union in accordance with Article 20, Section C, or they may transfer to other local unions in the area.

"Any disbandment, dissolution, secession or disaffiliation of any local shall be invalid and null and void if seven or more members indicate their desire to retain the local charter."

§ N provides that when a UE local union disbands its funds and property must be turned over to UE.

■ The primary relief sought in the present cases is a judgment declaring that, notwithstanding these contract provisions, Local 1140 and Local 1145 may disaffiliate from UE either by a majority vote or by unanimous vote and that they may take their property with them. Plaintiff's contention that they are entitled to a judgment declaring such rights is based upon the assertion that the contracts between UE and the two locals are subject to an implied condition that UE remain affiliated with CIO. They therefore contend that UE's rights under these contracts are unenforceable by reason of UE's expulsion from CIO. There is strong support for plaintiffs' contention in the reasoning contained in two recent opinions of New York and New Jersey courts upon facts almost identical with those in the cases at bar. Clark v. Fitzgerald, 197 Misc. 355, 93 N. Y. S. (2d) 768, 25 L.R.R.M. 2115; Duris v. Iozzi, 6 N. J. Super. 530, 70 A. (2d) 793. In both of those cases, after UE's expulsion from CIO, UE locals sought to disaffiliate from UE and keep their property. UE's attempt to obtain an injunction against such action was in both cases denied. In the Duris case the court stated (6 N. J. Super. 536, 70 A. [2d] 796):

"* * * When membership is sought by a labor union on the basis of an existing affiliation between itself and either of these two central organizations, that basis becomes and endures as a continuing condition of the membership it attracts. This condition need not be explicitly expressed; it is implicit in the circumstances under which members are sought and their association induced. To hold that members, so invited and enrolled, cannot emancipate themselves when the basic and inducing affiliation is destroyed, is not alone to do violence to a fundamental and controlling condition of membership but to impose a form of serfdom degrading to the individual and harmful to the public. Such evil result must be avoided and there is nothing in the law

of contracts that bars the way. Where the continued existence of a state of facts (here an affiliation) is an implied condition going to the essence of the contract, the destruction of that state of facts puts an end to the contract itself. The obligation is no stronger or more enduring than the foundation upon which it rests and will not survive the latter's collapse."

In the Clark case, the court also took the position which plaintiffs have taken here. There the court stated (197 Misc. 355, 93 N. Y. S. (2d) 774):

"When performance depends on the continued existence of a given thing and such continued existence is assumed as a basis of the agreement, an implied condition that such existence shall continue is to be read into the contract, and the destruction of the thing puts an end to the contract * * *; the event which renders the contract incapable of performance is the cessation or non-existence of an express condition or state of things going to the root of the contract. Where an event substantially frustrates the objects contemplated by the parties when they enter into the contract the foundation of the contract is gone."

The theory of implied condition on which these two courts rested their decisions appears to have been clearly recognized in England as early as 1916. In the case of F. A. Tamplin Steamship Co. Ltd. v. Anglo-Mexican Petroleum Products Co. Ltd. [1916] 2 A. C. 397, 403, the House of Lords handed down an opinion, written by Earl Loreburn, in which it was said:

"* * * When a lawful contract has been made and there is no default, a Court of law has no power to discharge either party from the performance of it unless either the rights of some one else or some Act of Parliament give the necessary jurisdiction. But a Court can and ought to examine the contract and the circumstances in which it was made, not of course to vary, but only to explain it, in order to see whether or not from the nature of it the parties must have made their bargain on the footing that

a particular thing or state of things would continue to exist. And if they must have done so, then a term to that effect will be implied, though it be not expressed in the contract."

The opinion goes on to analyze and explain the theory, as it had developed in England, in a manner which is most helpful. It states (2 A. C. 403):

"In the recent case of Horlock v. Beal (1) this House considered the law upon this subject, and previous decisions were fully reviewed, especially in the opinion delivered by Lord Atkinson. An examination of those decisions confirms me in the view that, when our Courts have held innocent contracting parties absolved from further performance of their promises, it has been upon the ground that there was an implied term in the contract which entitled them to be absolved. Sometimes it is put that performance has become impossible and that the party concerned did not promise to perform an impossibility. Sometimes it is put that the parties contemplated a certain state of things which fell out otherwise. In most of the cases it is said that there was an implied condition in the contract which operated to release the parties from performing it, and in all of them I think that was at bottom the principle upon which the Court proceeded. It is my opinion the true principle, for no Court has an absolving power, but it can infer from the nature of the contract and the surrounding circumstances that a condition which is not expressed was a foundation on which the parties contracted."

Although this court has not previously had occasion to apply the implied condition theory to facts similar to those now before us, the theory itself has been approved and applied in at least two Minnesota cases. In Dow v. State Bank, 88 Minn. 355, 363, 93 N. W. 121, 123, this court held that—

"where a contract is entered into, of a continuing character, or to be performed at a future time, dependent upon the continued existence of a particular * * * thing, * * * subsequent * * * de-

struction * * * will excuse the obligor from compliance with the terms of the contract. A condition is implied that if the performance becomes impossible, * * * by the perishing of the thing, performance of the contract is excused, and this implication arises in spite of the unqualified character of the promissory words."

Again, in Smith v. Zuckman, 203 Minn. 535, 540, 282 N. W. 269, 271, 272, this court cited with approval the following language of Browne v. Fairhall, 213 Mass. 290, 294, 100 N. E. 556, 557, 45 L.R.A.(N.S.) 349:

"* * * where the performance of a contract depends upon the continued existence of any particular * * * thing, there, if there is no warranty of such continued existence, performance is excused if before a breach of the contract its performance becomes impossible by reason of the * * * destruction of such * * * thing."

In the cases before us, the complaints allege that there was an implied agreement by UE to remain affiliated with CIO; that the affiliation of UE with CIO was a decisive factor in the desire of the local unions' members to affiliate with UE; that the desire of a large majority of the members of the local unions for affiliation with CIO was frustrated by UE's expulsion from CIO; that CIO affiliation was a major inducement to employes in joining the locals and UE; and other detailed allegations of the complaints serve as an adequate basis for holding that the continued affiliation of UE with CIO was a material implied condition of the contracts.

The question presented to us is whether, as a matter of law, defendants' contract rights are rendered unenforceable where a material implied condition of the contracts no longer exists. In accordance (1) with our own decisions cited above, (2) with the logic of the New York and New Jersey decisions cited above, which are so directly in point, and (3) with the excellent reasoning and analysis of the English decision cited above, we hold that, upon the facts alleged, defendants' contract rights are unenforce-

able, and, more particularly, that §§ N and O of the UE constitution cannot be enforced against plaintiffs.

■ Since, in this situation, UE has no enforceable contract right to control these locals, the question remaining for decision is whether, in the absence of contract rights enforceable by UE, Local 1140 and Local 1145 are entitled to retain their assets after disaffiliation from UE. The question of who is entitled to the property of a local union after its affiliation with the parent union has been severed is a matter that has been much discussed in law reviews throughout the country.[11]  Because of great variation in factual situations and in the procedural settings of the many cases in this field, neither the courts nor the legal commentators have been able to put the law relating to this problem into a concise statement. Because the relationships between parent organizations and subordinate organizations are in large part governed by contract, differences in relationships are legion. Since in the vast majority of cases involving disputes between a local and a parent union provisions in the parent union's constitution regulate matters of disaffiliation and disposition of the local union's property, our holding in the present cases that similar provisions in the UE constitution are unenforceable renders much of the case law on the subject inapplicable here. Our own decisions on this general problem in Liggett v. Koivunen, 227 Minn. 114, 34 N. W. (2d) 345, and State v. Postal, 215 Minn. 427, 10 N. W. (2d) 373, are distinguishable, not only because those decisions turned on enforceable provisions of the parent union's constitution, but also because the dispute in each case arose out of internal friction among the members of the local rather than out of a dispute between the parent and the locals, such as we have before us.  In the Liggett case, the opinion expressly excludes the problem presented in the present cases by stating (227 Minn. 119, 34 N. W. [2d] 348):

[11]Notes, 33 Minn. L. Rev. 156, 165; 58 Yale L. J. 1171; 47 Yale L. J. 483; 87 U. of Pa. L. Rev. 985, 990; 33 Ill. L. Rev. 977; recent cases, 34 Minn. L. Rev. 357; 62 Harv. L. Rev. 507.

"We are not dealing with the situation that would arise if the dispute over the funds were between the local unit and the parent organization, the International; * * *."

For reasons to be stated later, it appears to us that, in the absence of enforceable provisions in the parent union's constitution which prevent disaffiliation of a local union intact with its property, a local union by a majority or greater vote may sever its relationship with the parent union and, taking its property with it, may remain independent or seek a new affiliation. Taking this view, no distinction need be made between the case involving Local 1140 and the case involving Local 1145, for in both cases there was a large majority vote to disaffiliate.

■ We have already referred to the two cases nearest in point on the problems presented in the present cases. Clark v. Fitzgerald, 197 Misc. 355, 93 N. Y. S. (2d) 768, 25 L.R.R.M. 2115; Duris v. Iozzi, 6 N. J. Super. 530, 70 A. (2d) 793. In both cases, UE local unions by less than a unanimous vote of their members attempted to disaffiliate from UE intact with their property, and in each case the local union sought to renew its affiliation with CIO by affiliating with one of its subordinate unions, which had taken the place of UE. The fact situations presented in these cases are identical with that presented here. In both cases, UE representatives sought to enjoin such action by the locals, and in both cases injunctions were denied. In the Duris case, after holding that UE's contract rights were unenforceable by reason of UE's expulsion from CIO, the court went on to discuss whether a local union, by the will of its membership, could withdraw from its affiliation with UE and take its property with it. On this matter the court stated (6 N. J. Super. 536, 70 A. [2d] 796):

"* * * The constitution and by-laws of UE the parent organization provide that its revenue shall be derived by the payment of monthly *per capita* tax on each member of the Local. Dues by the workmen are not paid directly to the International but are paid to local union which in turn remits out of these dues a *per*

*capita* tax to the parent body. The existence of Local 441, its revenue and its functions, are not derived from or dependent upon the parent body so that the local union could well continue its existence and function without any relationship with UE. *The local union is a separate and distinct voluntary association which owes its creation and continued existence to the will of its own members."* (Italics supplied.)

That this view of UE's organizational pattern is in accord with our own law is manifest from what this court held in the case of State ex rel. UE v. Enersen, 230 Minn. 427, 441, 42 N. W. (2d) 25, 32, where it stated:

"It seems to us that it goes without saying that Local 1117 derives its existence from its membership and that UE in like terms exists by virtue of its affiliated locals. Both are unincorporated associations having no legal entity separate and apart from their memberships."

It is not, therefore, the UE affiliation which creates the associations known as Local 1140 and Local 1145. The locals exist by virtue of their membership and continue to exist notwithstanding the fact that they have renounced their UE charters and voted to disaffiliate. As one court has aptly stated with reference to the effect of a local union being expelled from affiliation to the Knights of Labor: "There has been a divorce, but that is quite different from a death." Wells v. Monihan, 129 N. Y. 161, 166, 29 N. E. 232, 233. Earlier in the opinion, the same court, in referring to the effect of the local's expulsion, made the following statement (129 N. Y. 165, 29 N. E. 233):

"* * * The offense and its punishment ended their powers and privileges so far, and so far only, as they were derived from the rules and regulations of the Knights of Labor, but could not destroy their rights as individuals or as an unincorporated association derived from the law of the state. Under that law they could, as they did, associate for a common purpose and choose officers

in whose name they could sue. These powers they had when their charter from the Knights was given, and retained when it was taken away. That event broke off their relations with the order but not with their own treasury."

UE exists in turn by virtue of its membership; hence, it is an argument 180 degrees off course to say that the locals owe their existence to UE when the truth of the matter is that UE owes its existence to the locals.

On facts almost identical with those in the cases at bar, the court of chancery of New Jersey handed down a well-reasoned opinion dealing with the problems which confront us here. International Union, etc. CIO v. Becherer, 142 N. J. Eq. 561, 61 A. (2d) 16. In that case, AFL expelled one of its international unions, and the international, over the protest vote of one of its own affiliated local unions, then affiliated with CIO. A majority of the members in the dissenting local union later voted to disaffiliate from the international and to seek reaffiliation with AFL. A dispute as to the disposal of the local's property arose between the international and the local. Speaking of the right of a local union to disaffiliate and keep its property, the court stated (142 N. J. Eq. 566, 61 A. [2d] 20):

" * * * I have examined the constitution of the International and find that it conforms to an old and well recognized pattern. It provides that any local group composed of 20 or more workers in the brewery, &c., industry 'can affiliate with the International Union' by applying for a local union charter and paying certain dues and assessments. It is true that under that constitution it is provided that a worker becoming a member of a local union becomes thereby also a member of the International, but the significant fact is that the International is a federation of local unions. Dues by the workmen are not paid directly or in the first instance to the International but are paid to the local union, which, in turn, remits out of these dues a *per capita* tax to the International. The relationship is closely analogous to that considered by the

Court of Errors and Appeals in the case of State Council, &c., v. Enterprise Council No. 6, 75 N. J. Eq. 245, 72 A. 19. That case involved the relationship between a national council, a state council and subordinate councils composed of individual members. These councils constituted a beneficial order, but the individual members paid their dues to their subordinate councils. Here, as there, the relationship between the individual members and their immediate organization (the subordinate council) constitutes the very life of the entire structure. The existence of the Local Union, its revenue and its functions, are not derived from or dependent upon the International. These individual unions could well continue their existence and their functions without any relationship with any national or international labor organization. Such relationship may have its decided advantages but it is not a *sine qua non*. On the contrary, the international union does depend for its continued existence upon affiliation with the local unions and upon receiving from the latter dues or *per capita* tax, or by whatever other name that revenue be called. Each local union is a separate and distinct voluntary association which owes its creation and continued existence to the will of its own members. The property accumulated by the local union from contributions made by the individual members is a trust fund for the benefit of those members, and though the legal title to such property may be vested in the officers of the local, such ownership is of a trust character for the use of the individual members. The affiliation with the international union undoubtedly creates the liability resting on the local union to pay, while such affiliation endures, the dues or *per capita* tax called for in the international charter, but that gives the international union nothing more than a claim or an account receivable. No direct property right in the local union's assets can or does arise in favor of the international. The relationship between the international and its constituent local unions is that the local unions are the constituent units in a confederation comprising the international. That confederation is a volun-

tary one and any local union is free to withdraw from the alliance. It cannot be rationally claimed that a combination of local unions constitutes a single indivisible and indestructible union from which no constituent may secede or be expelled."

Like the New Jersey court, which examined the international union's constitution in the above case, this court has examined the UE constitution and found that it conforms in all material respects to the old and well-recognized pattern described in the above quotation. The views set forth in the Becherer case are confirmed and elaborated in numerous other cases which are closely in point with the cases at bar. Harker v. McKissock, 1 N. J. Super. 510, 62 A. (2d) 405; Grand Court, etc., v. Court Cavour, No. 133, 82 N. J. Eq. 89, 88 A. 191; Moyer v. Butte Miners' Union (D. C.) 232 F. 788; Shipwrights, etc., Local No. 2, v. Mitchell, 60 Wash. 529, 111 P. 780; State Council v. Enterprise Council, No. 6, 75 N. J. Eq. 245, 72 A. 19; Wells v. Monihan, 129 N. Y. 161, 29 N. E. 232. Although some of the decisions in the above cases rest in part upon grounds other than those for which they are here cited, they uniformly uphold the right of independent local unions to disaffiliate and keep their property as against the parent union.

■ We find no merit in defendants' contention that the complaints in these cases do not sufficiently allege authorization of the local to bring this suit. Defendants' arguments on this point are that, since a suit to change a local union's affiliation is a matter of a vital nature, it should be alleged that the membership of the two locals authorized the bringing of these suits. Since on these demurrers it has been stipulated that a large majority of the members in both locals, who responded to a call to meet on the matter of disaffiliation, voted to disaffiliate, we regard this as a sufficient authorization for representatives of the locals to take such action as might be necessary to accomplish the objective for which the members voted.

■ Defendants also contend that plaintiffs cannot be allowed to resort to the courts until such time as they have exhausted their remedies within the international union. It is a sufficient answer to this objection that UE is alleged to have already announced its decision to prevent the disaffiliation of these locals, to forfeit their property, and to punish those members participating in the move to disaffiliate. The law does not require these plaintiffs to seek a remedy which has already been foreclosed.

Defendants have also sought in this case to appeal from the district court's order denying their motion to exclude plaintiffs' counsel. That matter has already been before us and has been decided adversely to defendants on the merits. Local 1140 v. United Electrical, Radio and Machine Workers of America, Nos. 35,211, 35,212, order of November 7, 1950 (not reported).

In the absence of an enforceable contract provision whereby the members of these local unions are bound to be controlled in their choice of affiliation by a minority group and in the absence of an enforceable provision which forfeits the property of the local unions to UE, the parent union, upon disaffiliation, we hold, for the reasons already set forth, that plaintiffs are entitled to a judgment declaring their right to disaffiliate from UE and to retain their assets.

The district court's orders overruling the demurrers to the complaints in these cases are accordingly affirmed.

Affirmed.